**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | | |
|---|---|---|
| GREGORY EATON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 2:16-cv-02764-TLP-cgc |
| v. | ) | |
| | ) | |
| RELIANCE STANDARD LIFE | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**ORDER DENYING PLAINTIFF'S MOTION FOR JUDGMENT ON THE
ADMINISTRATIVE RECORD AND GRANTING DEFENDANT'S MOTION FOR
JUDGMENT ON THE ADMINISTRATIVE RECORD**

Here, both parties move for Judgment on the Administrative Record. Mr. Gregory Eaton ("Plaintiff") asserts that he is entitled to judgment in his favor because his claim for long term disability payments was wrongfully denied under his employer's disability plan. By contrast, Reliance Standard Life Insurance Company ("Defendant") argues that it should prevail because the decision to deny Plaintiff's claim was reasonable and "the ERISA administrative record contains more than enough evidence to support [Defendant's] decision to terminate Plaintiff's claim for benefits, and [Defendant] did not abuse its discretion in doing so." (ECF No. 24 at PageID 57.) For the following reasons, this Court GRANTS Defendant's Motion for Judgment on the Administrative Record and DENIES Plaintiff's Motion.

<u>**BACKGROUND**</u>

**A.      Plaintiff's Employment and Premier Transportation's Disability Plans**

Plaintiff worked as an inventory clerk at Premier Transportation ("Premier") since 1991.  (ECF No. 27 at PageID 74.)  The job of inventory clerk requires the capacity for medium work.  (AR1339.)  His job duties included sitting, standing, walking, lifting heavy objects, and electronically entering work orders.  (AR0852.)

For the pertinent time here, Premier's Long-Term Disability Benefits Plan (the "Plan") covered Plaintiff.  (ECF No. 27 at PageID 74.)  Under the Plan, an employee is eligible for long-term disability benefits ("LTD benefits") during the first thirty-six months of the disability period if the employee experiences "Total Disability."  One meets the policy's definition of "Total Disability" if, "as a result of an [i]njury or [s]ickness . . . an insured cannot perform the material duties of his/her regular occupation."  (AR0007.)  After those thirty-six months, to remain eligible for ongoing benefits, the employee must satisfy a stricter definition.  To have a "Total Disability" after thirty-six months, the employee must be "capable of only performing the material duties [of the job] on a part-time basis or part of the material duties on a Full-time basis."  (AR0007.)

**B.      Plaintiff's Initial Filing**

Plaintiff filed his claim for LTD benefits because of an injury occurring on or about July 20, 2007.  (AR0023.)  Defendant received Plaintiff's claim.  (AR0281.)  Under the Plan, Defendant is the "claims reviewing fiduciary [with] the discretionary authority to interpret the Plan and the insurance policy and to determine eligibility for benefits."  (AR0009.)  In reviewing Plaintiff's claim, Defendant requested information from Plaintiff's employer, Premier, and medical records from Plaintiff's doctors, Dr. Adam Arthur, MD ("Dr. Arthur") and Dr. Trent Pierce, MD ("Dr. Pierce").  (AR0290.)  The medical records revealed that

Plaintiff underwent a left L5/S1 discectomy surgery in August 2007 (AR0694) and a repeat left L5/S1 discectomy in November 2007 when the first surgery proved unsuccessful. (AR0681–AR0682.)  Throughout 2007, both Dr. Pierce and Dr. Arthur noted Plaintiff's complaints of continued back and leg pain and listed the prescriptions Plaintiff was taking. Defendant approved Plaintiff's claim for LTD benefits early the next year.  (AR0293.)

Near the end of thirty-six months, Defendant informed Plaintiff that they needed more information to ensure that Plaintiff remained "Totally Disabled" after March 18, 2010. (AR0316.)  Defendant gave a deadline of January 20, 2010.  (*Id.*) But Plaintiff never responded.  On March 26, 2010, Defendant wrote to Plaintiff, explaining that Defendant would be "gathering updated information concerning [Plaintiff's] medical condition, education, training and experience" to determine whether Plaintiff was "Totally Disabled" from any occupation.  (AR0324.)  So Defendant instructed Plaintiff to complete an Activities of Daily Living form.  (AR0325–333.)  Plaintiff, once again, never responded.  Defendant thus terminated Plaintiff's LTD benefits for his failure to "submit[] satisfactory proof of Total Disability . . . ."  (AR0337.)

## C.    Plaintiff's Request for Review

Plaintiff timely submitted a written request for review.  Defendant determined that a Functional Capacities Evaluation was appropriate and requested, in June 2010, that Dr. Cicala complete one.  (AR0341.)  In the Administrative Record, there is no Functional Capacities Report.  Nevertheless, in May 2011, Defendant informed Plaintiff that it would continue to provide him with LTD benefits.  These LTD benefits continued for several years until May 2016.

**D.   Defendant's Continued Review of Plaintiff's Eligibility for LTD Benefits**

The following May, Defendant directed Plaintiff to complete the Activity of Daily Living form and to ensure that his physician complete the Attending Physician Statement. (AR0350.)  On the form, Plaintiff wrote that because his doctor had retired, he no longer had access to pain management, thus causing his pain to be significant.  (AR0960.)  According to Plaintiff, he "cannot travel any length of distance [and] [he is] limited on time in vehicle." (AR0963.)  Plaintiff also stated that he cannot participate in any of the hobbies he used to enjoy, including hunting and fishing.  (AR0964.)  He also wrote that he is "not really" an active member of any clubs or organizations.  (AR0965.)  Dr. Pierce's progress notes, attached to his Attending Physician's Statement, reveal that Dr. Pierce informed Plaintiff in May 2011 and July 2011 that he would not prescribe pain medication for Plaintiff and that he would not be able to take care of Plaintiff's chronic back pain.  (AR0971, AR0972.)  He explained to Plaintiff that he needed to see a pain management specialist.  (AR0972.)

A year later, in reviewing Plaintiff's claim for LTD benefits, Defendant requested a completed Supplementary Report for Continued Benefits from Plaintiff, as well as current medical records from his physician. (AR0358.)  Plaintiff's physician, Dr. Pierce, again provided progress notes that revealed he was still trying to get Plaintiff to see pain management specialist and gave Plaintiff's girlfriend the name of three doctors to contact. (AR0988.)  Additionally, Dr. Pierce provided the medical records of Plaintiff's most recent MRI, which revealed a "very very small" disc herniation.  (AR0991.)  Also during 2013, Defendant obtained a Residual Employability Analysis on Plaintiff's file, identifying nine additional light exertion occupations that Plaintiff could perform.  These occupations included laundry clerk, order detailer, receiver-dispatcher, bookmobile driver, process server,

information clerk-cashier, trophy assembler, quality-control checker, and mobile-lounge driver. (AR0608–09.) Defendant continued to pay Plaintiff LTD benefits.

After another year went by, Defendant instructed Plaintiff and his physician to complete a Supplementary Report. Defendant continued to pay Plaintiff LTD benefits.

Then, on July 31, 2015, Defendant instructed Plaintiff to complete an Activities of Daily Living questionnaire. On the questionnaire, Plaintiff explained that his back pain was still persistent and was interfering with his sleep. (AR1088.) He also explained that "he cannot walk any" because of his limping and that his "left side [is] progressively getting worse." (AR1099.) Plaintiff, on another section of the form, stated again that he is "[b]arely able to walk" and that his "left leg drags." He has to "sit for long periods of time" and his "tail bone/nerve goes dead." (AR1118.) He claimed the ability to drive a couple times a week, but no more than 40 to 50 miles. (AR1088.) As a passenger, he stated that he could ride up to 70 to 100 miles if there is "space to lay over off tail bone." (*Id.*) Plaintiff wrote that he was not a member of any clubs or community organizations, but that he attended semi-frequent Jeep Club meetings as a guest of his friend. (AR1097.) He also claimed to be unable to hunt or fish because of his pain. (AR1098.) The updated medical records provided by Dr. Pierce revealed no major change in Plaintiff's situation. (AR1129–46.) Plaintiff was still experiencing chronic pain, but he made no mention to Dr. Pierce of his inability to walk, his left leg dragging, or his tail bone going "dead." (*Id.*) In 2015, Plaintiff visited Dr. Alan Nadel, MD ("Dr. Nadel"), because of pain in his hands. (AR1092.) Dr. Nadel opined that Plaintiff was suffering from bilateral carpal tunnel syndrome, but that there was no denervement. (AR1096.) Dr. Nadel also opined that conservative treatment of wearing a

wrist splint would be sufficient and that there was no need for further evaluation. (*Id.*) Defendant continued to pay Plaintiff LTD benefits.

In early 2016, Defendant, in continuing to review Plaintiff's claim for LTD benefits, directed Plaintiff to provide another Supplementary Report along with a list of his current medical providers. (AR0394.) Plaintiff wrote nothing of use. (AR1159.) He wrote "same" over the section asking about any gainful employment and left the section asking when he believed he could return to work completely blank. (*Id.*) Plaintiff listed Dr. Dan Webb, MD ("Dr. Webb") as his current medical provider. (AR1166.) Defendant subsequently sent records requests to both Dr. Webb and Dr. Pierce. Dr. Pierce's medical records from July 2015 revealed no new information. (AR1197–1201.) Dr. Webb appears to have first examined Plaintiff in November 2015 and noted Plaintiff's complaints of "mild-moderate" back pain. (AR1184.) Plaintiff also told Dr. Webb that he experienced "shooting pain down left leg" and that he walked with a limp. (*Id.*) Dr. Webb refilled Plaintiff's prescriptions. (AR1187.) Plaintiff had another visit with Dr. Webb in February 2016, in which Plaintiff complained of back pain that "never goes away" but is "dull[ed]" by pain medication. (AR1189.) Dr. Webb prescribed Plaintiff his usual prescriptions. (AR1190–92.)

Additionally, during March and April 2016 Defendant hired an investigator to conduct surveillance on Plaintiff. (AR1202.) The investigator observed Plaintiff on March 19, 2016, driving to a Jeep Club meeting and then driving to a restaurant with the group. (*Id.*) Plaintiff "displayed the ability to use both arms as he carried items and took pictures with his phone above his head." (*Id.*) On April 1, 2016, the investigator observed Plaintiff "loading drinks, pillows, blankets, and other camping items into the Jeep and then strapp[ing] down the loose items in the trailer." (AR1203.) He "displayed the ability to use both arms, bend at his waist

and raise his legs to hip height as he had to step over the trailer hitch multiple times."

(AR1208.)  Plaintiff was preparing for a camping trip at an off-road park in Alabama.  (*Id.*)

On May 24, 2016, Defendant terminated Plaintiff's LTD benefits based on a culmination of information.  (AR0405.)  The letter noted:

> On the [Activities of Daily Living] Form completed by you on 8/18/15, you reported that you were barely able to walk, a drag of the left leg, and that it is hard to sit for long periods of time due to the tail bone nerve going dead.  In addition, you noted difficulties driving and sitting as a passenger.  You indicated you can only drive 40-50 miles; as a passenger, you could potentially travel longer (70-100 miles) so long as there is space to lie.  Additionally, on the same ADL Form mentioned above, you stated that you sometimes attend a Jeep Club every few months as a friend's guest to talk about Jeeps. Surveillance was conducted over the course of several days, where it was found that you are the Secretary of the Mid-South Jeep Club.  You were observed to be driving your vehicle on the off-road trials . . . [S]everal YouTube videos you have posted show your ability to drive among the conditions of off-roading trials.  Surveillance also showed your ability to ambulate without a foot drag, stand for periods of time, and bend at the waist. Medical Records from Dr. Webb note that pain is consistent, but is dulled by medications.

(AR0406.)

## E.    Plaintiff's Appeal and Independent Medical Review

Plaintiff timely appealed.  (AR1220.)  He supplemented his appeal with additional medical records from the years 2007, 2008, 2009, and 2010.[1]  (AR1228–50; AR1261–86; AR1290–1303; AR1306–19.)  Plaintiff also attached a copy of MRI results from 2016.

---

[1] The medical records with which Plaintiff supplemented his appeal are as follows.  Two records simply show that Plaintiff underwent caudal epidural blocks in 2007 and 2008. (AR1268, AR1270.)  Another record is the Operative Report for Plaintiff's first surgery in July 2007.  (AR1271–72.)  A 2007 MRI and chest x-ray were included (AR1277, AR1279–80), as well as lab reports from 2007 (AR1281–86.)  There is an Operative Report for Plaintiff's second surgery (AR1290–1291), as well as medical records from Dr. Cicala spanning from 2008 to 2010 (AR1292–1303.)  All of Dr. Cicala's medical records show that Plaintiff's pain medication worked well.  Plaintiff also provided medical records from Dr. Arthur from 2007, simply showing that Plaintiff needed surgery and that the first surgery was unsuccessful.  (AR1306–19.)

(AR1253–54.)  Defendant then submitted Plaintiff's file to an independent physician, Dr.

Susan Zuckerman, MD ("Dr. Zuckerman") for peer review.  (AR0411, AR0416.)  Upon

review, Dr. Zuckerman concluded that Plaintiff was not totally disabled.  Dr. Zuckerman

noted that Plaintiff's file contained "no medical data to substantiate the presence of subjective

complaints as of May 18, 2016."  (AR1329.)  "[T]he medical condition impacting [Plaintiff's]

status as of May 18, 2016 is chronic back pain" according to Dr. Zuckerman.  (AR1329.)  Dr.

Zuckerman's report concludes that Plaintiff has "work capacity on a fulltime consistent basis"

with no impairments that would "warrant any restrictions or limitations from a physical

medicine and rehabilitation standpoint."  (AR1330.)  At the very least, Plaintiff could work at

a sedentary level.  (*Id.*)

Defendant denied Plaintiff's appeal on August 16, 2016.  (AR0413.)  The denial letter

discussed Defendant's analysis of Plaintiff's medical records, making specific reference to the

two Independent Medical Evaluations performed by Dr. Rizt.  (AR0415.)  And Defendant

discussed the surveillance footage that supported the Medical Department's conclusion that

Plaintiff was "capable of at least light functioning with the ability to sit, stand and walk

frequently."  (AR0416.)  Defendant also considered the findings of Dr. Zuckerman, who

concluded that Plaintiff could work at a sedentary level on a fulltime consistent basis.

(AR0417.)  The denial letter concluded:

> We have conducted an independent review of his claim file and have
> determined that our original decision to terminate benefits was appropriate.
> Not only did Dr. Zuckerman clearly note, based upon a review of all medical
> documentation on file, that [Plaintiff] is capable of at least sedentary work, but
> the activity captured on video surveillance is unequivocally indicative of an
> individual who appears largely unencumbered by his history of back surgeries
> and capable of sedentary work function at the very minimum . . . . Please be
> advised that our claim decision is now final as [Plaintiff] has exhausted any
> administrative remedies available to him under the terms of the Policy . . . . In
> the event that his claim is subject to the Employee Retirement Income Security

Act of 1974 . . . . [Plaintiff] has the right to bring civil action under section 502(a) of the Act following an adverse benefit determination on review . . . .

(*Id.*)

Plaintiff filed a civil action against Defendant under the Employment Retirement Income Security Act ("ERISA"), arguing that Defendant improperly denied Plaintiff LTD benefits. (ECF No. 1.) Both parties filed competing Motions for Judgment on the Administrative Record. (ECF Nos. 24–27.)

## DISCUSSION

### A. Standard of Judicial Review

Section 502(a)(1)(B) of ERISA allows an individual to sue a plan administrator "to recover benefits due to him under the terms of his plan . . . ." 29 U.S.C. § 1132(a)(1)(B). When reviewing a denial of benefits under ERISA, the administrative record (i.e., the evidence available to the administrator at the time of final decision) is a court's sole and complete universe of evidence. *See Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 618 (6th Cir. 1998). A court may not consider evidence outside the administrative record. *See Schwalm v. Guardian Life Ins. Co. of Am.*, 626 F.3d 299, 308 (6th Cir. 2010); *see also McClain v. Eaton Corp. Disability Plan*, 2014 U.S. App. LEXIS 1354, *9–10 (6th Cir. Jan. 24, 2014). To allow district courts to review additional evidence frustrates the role of plan administrators, as well as ERISA's efficiency goals. *See Perry v. Simplicity Eng'g*, 900 F.2d 963, 966 (6th Cir. 1990) ("Permitting or requiring district courts to consider evidence from both parties that was not presented to the plan administrator would seriously impair the achievement of [ERISA's] goal. If district courts heard evidence not presented to plan administrators, employees and their beneficiaries would receive less protection from Congress.").

Generally, a court reviews the denial of eligibility under an employee-benefits plan de novo. *See Schwalm*, 626 F.3d at 308. Yet here, the parties are correct that, because the Plan designates Defendant as the "claims fiduciary [with] the discretionary authority to interpret the Plan and the insurance policy and to determine eligibility for benefits," the more deferential arbitrary and capricious standard of review applies. *See id.*; (ECF No. 25 at PageId 64–65; ECF No. 27 at PageID 82.)

The arbitrary and capricious standard is a highly deferential form of judicial review— "[w]hen it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary and capricious." *Shields v. Reader's Digest Ass'n, Inc.*, 331 F.3d 536, 541 (6th Cir. 2003) (quotation marks and citations omitted). In ERISA cases analyzed under the arbitrary and capricious standard, the question is whether the administrative record supports a "reasonable explanation for the administrator's decision denying benefits." *Williams v. Int'l Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000). Although the arbitrary and capricious standard is by no means a rubber stamp, and a court must review the "quantity and quality of the medical evidence on each side," a denial of benefits by the plan administrator "must be upheld if it results from 'a deliberate principled reasoning process' and is supported by 'substantial evidence.'" *Schwalm*, 626 F.3d at 308 (quoting *Evans v. UnumProvident Corp.*, 434 F.3d 866, 876 (6th Cir. 2006) and *Baker v. United Mine Workers of Am. Health & Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991)). In fact, Plaintiff described the standard of review as follows—"[T]he plan administrator's decision will be upheld if it results from a deliberate, reasoning process and if it is supported by substantial evidence." (ECF No. 27 at PageID 82 (citing *Glenn v. Metlife*, 461 F.3d 660, 665 (6th Cir. 2006).)

**B.     Plaintiff's Motion for Judgment on the Administrative Record Fails to Establish that Defendant's Benefits Decision was Irrational in Light of the Plan's Provisions and the Administrative Record**

Plaintiff advances three primary arguments about why Defendant's denial of benefits was arbitrary and capricious—(1) Defendant has a conflict of interest, (2) Defendant improperly relied on surveillance evidence gathered by an investigator, and (3) Defendant improperly relied on a Peer Review of an independent physician.  That said, the question for the Court to answer is whether Defendant offers a reasoned explanation, based on the evidence, for its judgment that Plaintiff was not "totally disabled" under the Policy.

**1.     Whether Defendant has a Conflict of Interest that Makes Its Decision Arbitrary and Capricious**

Plaintiff maintains that Defendant terminated his LTD benefits to save money because it has a conflict of interest—Defendant both insurers and administers the Plan.  (ECF No. 27 at PageID 87–88.)  Plaintiff has a point.  "Although the existence of a conflict of interest does not alter [the] standard of review, [the] court must take into consideration the conflict as a factor in determining whether [the defendant's] decision was arbitrary and capricious." *Rose v. Hartford Financial Services Group, Inc.*, 268 F. App'x. 444, 449 (6th Cir. 2008) (citing *Calvert v. Finstar Fin., Inc.*, 409 F.3d 286, 292–93 (6th Cir. 2005)).  In examining this conflict of interest, "the court must 'look to see if there is evidence that the conflict in any way influenced the plan administrator's decision.'" *Id.* (citing *Carr v. Reliance Standard Life Ins. Co.*, 363 F.3d 604, 606 n.2 (6th Cir. 2004)).

Plaintiff presents no evidence here that Defendant's conflict of interest influenced its decision to terminate Plaintiff's LTD benefits.  Instead, Plaintiff makes the unsubstantiated statement that "[a]fter denying Mr. Eaton's claim and terminating benefits, it is obvious [that] Reliance wished to terminate benefits in order to stop paying the claim."  (ECF No. 27 at

PageID 88.)  This broad statement, without more, simply does not develop the record to show a conflict of interest.  The Court finds that, if there is a conflict of interest present here, Plaintiff has failed to show that it influenced the decision.  The Court therefore finds that Defendant's actions were not arbitrary and capricious or based on its conflict of interest.

### 2. Whether Defendant Erred in Relying on Surveillance Video to Deny Plaintiff's LTD Benefits

Plaintiff argues that Defendant's denial of his LTD benefits was not a product of a principled and deliberate reasoning process because Defendant relied on "a series of videotapes taken by a private investigator who was employed by [Defendant] to do unauthorized surveillance of [Plaintiff]."  (ECF No. 27 at PageID 87.)   What is more, Plaintiff believes that the surveillance footage does not contradict his claims of disability. (*Id.*)  Yet Plaintiff also contends that Defendant acted in error by relying on the surveillance footage without the support of other evidence.  (*Id.*)  Plaintiff cites no case law in support of his arguments.

First, the Court does not agree with Plaintiff that the video surveillance was "a "questionable piece of evidence" and "unauthorized."  There is no case law that prohibits a plan administrator from conducting surveillance of a claimant, nor is there any language in the Policy that prohibits Defendant from gathering surveillance videos.  In fact, case law suggests that surveillance by plan administrators is routine, *see, e.g., Boone v. Liberty Life Assur. Co. of Boston*, 161 F. App'x 469, 473 (6th Cir. 2005), and courts have approved the use of surveillance footage in determining whether the claimant is disabled, *see Rose*, 268 F. App'x at 451–54.  Defendant explained their reasoning for hiring a private investigator to conduct surveillance of Plaintiff:

> In an effort to further assess the statements made on the [2015 Activities of Daily Living form]—specifically the assertion that he was barely able to walk,

which contrasts the findings of both of Dr. Rizk's IME reports—the Claims Department arranged for video surveillance of [Plaintiff's] activity over multiple days in February, March, and April 2016.

(AR0415.) This explanation suggests a deliberate and reasoned choice by Defendant. As a result, Defendant did not act improperly in gathering surveillance footage of Plaintiff.

Second, the Court finds that the Defendant utilized the surveillance footage properly. A plan administrator is not "required to 'ignore the inconsistencies between [a plaintiff's] assessment of her [or his] level of activity and the videotape of [those] activities.'" *Rose*, 268 F. App'x at 451 (citations omitted). That said, the inconsistencies must be more than minor. *See Hunter v. Life Ins. Co. of North America*, 437 F. App'x 372, 378 (6th Cir. 2011) (unreported) ("[W]hile the surveillance footage reveals some discrepancies between [the defendant's] stated and observed functionality, these inconsistencies are relatively minor, and do not indicate that Hunter can perform all the physical duties of her former occupation . . . [and] Hunter has never disputed her ability to occasionally sit, stand, walk, reach, or drive."). And the Sixth Circuit requires that the plan administrator not base its decision to terminate benefits solely on surveillance footage. *See Barnes v. Hartford Life and Acc. Ins. Co.*, No. 07-12141, 2008 WL 4298466, at *10 (E.D. Mich. Sept. 18, 2008) ("[R]eliance on the video surveillance, in conjunction with other evidence, does not establish arbitrariness."); *Moore v. Metropolitan Life Ins. Co.*, No. 2:08-CV-06, 2010 WL 396298, at *14 (E.D. Tenn. Jan. 27, 2010) ("This letter set forth the reasons for terminating benefits, and it is clear that the surveillance video played a part in that decision. However, it was not the primary basis for the decision . . . [T]he Court cannot conclude that the defendants improperly relied upon the surveillance video.").

In addressing Plaintiff's concern that Defendant improperly relied on surveillance footage, the Court finds that Defendant did not base its decision to terminate Plaintiff's LTD benefits solely on the surveillance footage. While it is undeniable that the video footage played a role, perhaps a significant role, in Defendant's decision, it was not improper. Defendant noticed a discrepancy between Plaintiff's 2015 Activities of Daily Living Form and Dr. Rizk's Independent Medical Evaluation, which prompted Defendant to request surveillance. After reviewing the surveillance footage and the updated medical documentation sent by Dr. Webb and Dr. Pierce in 2015 and 2016, Defendant determined that Plaintiff was capable of at least light functioning. (AR0416.) In doing so, Defendant relied on the surveillance videos combined with the medical records.

Additionally, unlike the surveillance videos at issue in *Wagner v. American United Life Insurance Company,* No. 17-4072, 2018 WL 2065076, at *2 (6th Cir. May 3, 2018), which only "captured [the plaintiff] for 20 minutes over a two-hour period, and only for a few minutes at a time," the surveillance videos of Plaintiff here lasted significantly longer and showed Plaintiff partaking in activities for hours at a time. Also both the doctors and the plaintiff in *Wagner* readily admitted that the plaintiff's pain "would come and go," so the sporadic surveillance video ultimately revealed no inconsistencies. *Id.* Here, Plaintiff has repeatedly stated over the years that his pain is constant and deliberating.

As late as his 2015 Activities of Daily Living form, Plaintiff claimed that he could not bend because of back pain, could not walk any length of time, could not sit for more than one to two hours, and could not drive more than a couple times a week for no more than 40 to 50 miles. (AR1115, AR1116, AR1118, AR1088.) In the same form, Plaintiff claimed that he could barely walk, that he dragged his left leg, and could only perform small household

activities that do not require bending.  (AR1104, AR1105.)  The surveillance footage

contradicted all of this information.  Plus, it contradicted his subjective complaints made to

Dr. Webb in November 2015 that there are no relieving factors for his pain because the pain is

so severe and that he walks with a limp.  (AR1184.)

For example, one surveillance video showed Defendant attending a MidSouth Jeep

Club meeting, a club for which he is the Secretary.  (AR1204.)  He drove himself and his wife

to the meeting.  (*Id.*)  After the meeting, he and his wife arrived at a restaurant and remained

there for around two hours.  (AR1204–06.)  While at the restaurant, the video shows

Defendant standing for extended periods of time, walking, raising his arms to take photos of

the group, and smoking a cigarette.  (*Id.*)

The April 2016 surveillance footage also revealed more than minor inconsistencies.

On one day, the surveillance footage showed Defendant leaning down to load drinks into a

cooler in his trailer.  (AR1207.)  Defendant continued to walk to and from his house to his

Jeep to load pillows, blankets, and other objects.  (AR1209.)  This footage shows Plaintiff

repeatedly bending over.  Defendant drove himself and his wife for about four hours until they

reached their destination in Alabama.  (AR1211.)  Although the investigator did not follow

Defendant into the woods, the footage showed Defendant, along with the rest of the group,

driving to the off-road trails.[2]  (AR1214.)

It is clear to the Court that the video surveillance did in fact reveal inconsistencies

between what Plaintiff reported about his health and what he could do.  The March and April

2016 videos show Plaintiff easily moving about with no physical indications of pain.  There is

---

[2] There are also YouTube videos, uploaded by Plaintiff in 2015, of a dashboard camera
recording of Plaintiff off-roading in his Jeep.  (AR1154.)  Plaintiff's caption was "just riding
around Smorr Midsouth Jeeps Spring Run 2015."  (*Id.*)

no footage of Plaintiff limping or barely being able to walk. It stands to reason that, if Plaintiff were, in fact, totally disabled, a surveillance video taken over a long span of time would show Plaintiff in the constant and deliberating pain that he alleges. Here, it did not. Defendant's reliance on such overwhelming contradictory surveillance footage is not arbitrary and capricious.

Lastly, the Court disagrees with Plaintiff that the surveillance footage is not "damaging" and does not "contradict [Plaintiff's] assertion that he is disabled as to any type of employment." As explained above, the Court, after viewing the surveillance footage and reading the investigative report, finds that the videos contradict Plaintiff's assertions.

### 3. Whether Defendant Erred in Relying on an Independent Physician's Peer Review to Deny Plaintiff's LTD Benefits

Because it relied on an Independent Physician's Peer Review, Plaintiff claims that Defendant's denial of his LTD benefits was not a product of a principled and deliberate reasoning process. Here the Independent Physician's Peer Review was prepared by Dr. Susan Zuckerman. (AR0411, AR0416.) Plaintiff maintains that Dr. Zuckerman's review is defective for four reasons—(1) she failed to discuss the diagnosis of Plaintiff's two failed back surgeries, (2) she failed to discuss the carpal tunnel syndrome "or the other diagnosis" that Plaintiff was suffering from, (3) she stated that Plaintiff had no medical impairment, and (4) her opinions differed from after another doctor who opined, on two separate occasions, that Plaintiff was totally disabled for full time work. (ECF No. 27 at PageID 83.)

Like Plaintiff here, others have argued that independent medical reviews are suspect. While there is "nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination," it "may, in some cases, raise questions about the

thoroughness and accuracy of the benefits determination." *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 295–96 (6th Cir. 2005).

The Court will examine each of his five arguments separately.

(1)     The Court begins with Plaintiff's assertion that Defendant ignored the opinions of his treating physicians following his back surgeries.  (ECF No. 27 at PageID 87.) Plaintiff's argument in this regard is unconvincing.  Dr. Zuckerman reviewed all the medical records of Plaintiff, including the records that refer to his back surgery.  Although she did not specifically include the word "diagnosis" in her summary of Plaintiff's medical history, she did refer, several times, to Plaintiff's two back surgeries.  Plus, she clearly articulated the back pain about which Plaintiff complained.  There is nothing in this record that suggests to the Court that Dr. Zuckerman failed to consider this "diagnosis."

(2)     Plaintiff's second argument is that Dr. Zuckerman failed to discuss his carpal tunnel syndrome or "other diagnosis", thus tainting Defendant's decision to terminate his benefits.  First, the Court is unsure what Plaintiff is referring to when he uses the phrase "other diagnosis."  The court conducted a thorough review of the medical records in the administrative record and the pleadings and yet the "other diagnosis" remains a mystery.  That said, the Court is confident that Dr. Zuckerman reviewed whatever medical record contains this "other diagnosis" because Dr. Zuckerman reviewed all of Plaintiff's medical files.

As for the carpal tunnel syndrome, Dr. Nadel reported that "[Plaintiff] is suffering from bilateral carpal tunnel syndrome but fortunately, there is no denervation."  (AR1111.) Dr. Nadel also opined that only conservative treatment, such as wearing a wrist splint, was necessary.  (*Id.*)  Even though this medical report is unremarkable, Dr. Zuckerman still reviewed it.  In fact, Dr. Zuckerman explicitly discusses the "electrodiagnostic report . . .

completed by Dr. Nadel" and summarizes Dr. Nadel's findings that "[t]here is no denervation and no evidence of cervical radiculopathy." (AR1327.) Plaintiff's argument that Dr. Zuckerman failed to discuss his carpal tunnel syndrome is meritless.

(3) Plaintiff contends that, because Dr. Zuckerman concluded that Plaintiff had no medical impairment, her opinion is unreliable. In sum, Plaintiff argues that, under the American Medical Association Guidelines and the American Orthopedic Surgeon Guidelines, Plaintiff does have conditions that qualify as medical impairments. Thus, says Plaintiff, Defendant's reliance on Dr. Zuckerman's findings was not a product of a principled and deliberate reasoning process. The Court finds Plaintiff's argument here unpersuasive.

The administrative record, consisting of 1,343 pages, lacks any American Medical Association Guidelines or American Orthopedic Surgeon Guidelines. Plaintiff's attempt to reference these documents without making them part of the record is unavailing and unpersuasive. "Generally, a court reviewing a party's ERISA claim cannot consider evidence outside the Administrative Record. Limited discovery may be appropriate, however, when consideration of evidence is necessary to resolve an ERISA claimant's procedural challenge to the administrator's decision." *Likas v. Life Ins. Co. of North America*, 222 F. App'x. 481, 485–86 (6th Cir. 2007). Examples of such procedural challenges include "allegations that the administrator failed to provide due process or was biased in some way." *Id.* at 486. Because Plaintiff refers to information which is not in the administrative record, and Plaintiff's challenge is not procedural, the Court will not make a determination about whether Dr. Zuckerman's findings were or were not in accordance with the American Medical Association Guidelines or the American Orthopedic Surgeon Guidelines.

(4)     Plaintiff also challenges the fact that Dr. Zuckerman's opinions were contrary to Defendant's previous determinations that Plaintiff was totally disabled on "two separate occasions."  (ECF No. 27, at PageID 83.)  Presumably, Plaintiff is referring to the findings of Dr. Rizk.  The Court classifies this as a "timing" argument.  The Court has reviewed the administrative record and finds only one Independent Medical Evaluation by Dr. Rizk, dated September 12, 2013.  (AR1012.)   There is no dispute that Plaintiff received LTD benefits until 2015.  Defendant, relied on the finding, or findings, of Dr. Rizk and upon additional medical evidence in deciding to continue to pay LTD benefits to Plaintiff.  Plaintiff seemingly argues that Defendant should ignore new evidence, but the law does not support that position.

Given the revelation of new evidence in 2015, Defendant did not act in error when it requested an Independent Peer Review from Dr. Zuckerman.  It is not arbitrary and capricious to utilize an Independent Peer Review after LTD benefits have been awarded to a claimant. *See Calvert*, 409 F.3d at 289–91, 295–97.  In *Calvert*, while the Sixth Circuit held the administrator's decision to be arbitrary and capricious for other reasons, the court had no issue with the administrator retaining a peer review after previously granting the claimant's LTD benefits.  *Id.*  The Court finds Plaintiff's timing argument unconvincing.

(5)     While Plaintiff did not expressly raise this as a separate argument, the Court gathers from his supporting Memorandum that Plaintiff believes Defendant failed to consider properly the opinions of his treating physicians.  The Court would note that the Supreme Court has expressly held that "plan administrators are not obliged to accord special deference to the opinions of treating physicians."  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003).

But "a plan administrator may not arbitrarily disregard the medical evidence proffered by the claimant, including the opinions of her treating physicians." *Calvert*, 409 F.3d at 294 (citing *Nord*, 538 U.S. at 834).  And the Sixth Circuit has found it to be arbitrary and capricious when a plan administrator fails to have the file reviewing physician fully review the treating physician's records.  *Smith v. Continental Cas. Co.*, 450 F.3d 253, 262 (6th Cir. 2006).  The Sixth Circuit has also explained that ignoring important pieces of evidence and making "factually incorrect assertion[s]" leads to a finding that the plan administrator acted in an arbitrary and capricious manner.  *Shaw v. ATT&T Umbrella Ben. Plan No. 1*, 795 F.3d 538, 548 (6th Cir. 2015) (citing *Butler v. United Healthcare of Tenn., Inc.*, 764 F.3d 563, 568 (6th Cir. 2014).)  In other words, "engag[ing] in a selective review of the administrative record to justify a decision to terminate coverage" is not permitted.  *Id.* at 549.

Here Defendant provided Dr. Zuckerman and Dr. Zuckerman reviewed, all of Plaintiff's medical records, including those of Plaintiff's treating physicians.  (AR1322–26).  She did not engage in a selective review of the administrative record.  Instead, Dr. Zuckerman summarized records from Plaintiff's treating physicians, including Dr. Webb's 2015 and 2016 reports and Dr. Pierce's 2015 medical reports.  (AR1327–28.)  Dr. Webb first started treating Plaintiff in November 2015.   Notably, because Dr. Webb did not have an established doctor-patient relationship with Plaintiff, his opinion about Plaintiff's functionality stemmed only from two appointments.  *Cf. Rose*, 268 F. App'x at 450 (finding that the plan administrator's decision to credit the opinions of independent medical examiners over the claimant's newly retained treating physician's opinion is not arbitrary and capricious).

Dr. Webb reported that Plaintiff complained of on-going "mild-moderate" back pain.  (AR1184.)  He also wrote that Plaintiff stated he "[w]alks with a limp."  (*Id.*)  Based on those

self-reported symptoms, and Dr. Webb's positive review of symptoms for back pain, decreased mobility, joint pain, and joint tenderness, Dr. Webb prescribed Plaintiff pain medication. (AR1184–1186.) In February 2016, Plaintiff returned to Dr. Webb for a re-check and Plaintiff "want[ed] to have all medications refilled." (AR1189.) At this appointment, Plaintiff stated that "[p]ain medicine help dull the pain but it never goes away – but does help." (*Id.*) Dr. Webb refilled all his pain medications. (AR1192.)

Dr. Pierce, who had been treating Plaintiff since at least 2004, wrote in his February 2015 report, reviewed by Dr. Zuckerman, that Plaintiff "states he is doing fairly well." (AR1130.) On that visit, and on the other two visits in 2015, Dr. Pierce continued to prescribe Plaintiff's pain medications. The Court finds it noteworthy to point out that Dr. Pierce routinely prescribed Plaintiff pain medication, even before the injury that caused his alleged disability. For example, in 2006, Dr. Pierce prescribed Vicodin for Plaintiff's left otitis (AR1066), and in January 2007, Dr. Pierce prescribed Vicodin for Plaintiff's flu symptoms (AR1066.) While in some circumstances such prescriptions may signal severe pain, it need not signal such a finding under the facts here.

Because it is unsurprising to the Court that Dr. Pierce prescribed pain medication to Plaintiff for his alleged chronic back pain in 2015, and Dr. Webb re-filled Plaintiff's prescriptions, the Court finds that there is a reasonable explanation based on the evidence for Dr. Zuckerman's opinion that Plaintiff was not disabled. In relying on Dr. Zuckerman's opinion, Defendant did not act in an arbitrary and capricious manner.

Additionally, unlike Plaintiff's treating physicians, the Court notes that Dr. Zuckerman reviewed the surveillance videos taken of Plaintiff in 2016. As explained before, the Defendant properly obtained the surveillance videos and it was acceptable for Dr. Zuckerman,

the file reviewing physician, to have access to such videos.  *See generally Rose*, 268 F. App'x at 450–51 (finding no error in a physician conducting a file review to rely on surveillance footage); *Zenadocchio v. BAE Systems Unfunded Welfare Ben. Plan*, 936 F. Supp. 868, 891 (6th Cir. 2013) (explaining that it would have been helpful, and less likely to lead to a finding of arbitrary and capricious if the file reviewing physician had access to surveillance footage of the claimant).  The surveillance videos contradict Plaintiff's self-reported symptoms and limitations because Plaintiff "conducted [himself] in a manner contrary to [his] claimed level of functionality."  *Hunter*, 437 F. App'x at 379 n.5 (distinguishing and citing *Rose*, 268 F. App'x at 451).  The Court thus concludes that Defendant's reliance on the independent file reviews of Dr. Zuckerman, who reviewed Plaintiff's medical records and viewed the surveillance videos, was not arbitrary and capricious.

## CONCLUSION

This Court finds that Defendant did not act arbitrarily and capriciously in denying Plaintiff disability benefits. This Court therefore DENIES Plaintiff's Motion for Judgment on the Administrative Record and GRANTS Defendant's Motion for Judgment on the Administrative Record.

**SO ORDERED**, this 31st day of July, 2018.

s/Thomas L. Parker
THOMAS L. PARKER
UNITED STATES DISTRICT JUDGE